# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

| | |
|---|---|
| SABRINA JOHNSON-NIXON, | |
| Plaintiff, | |
| v. | No. 2:19—CV-98 |
| WAYNE COUNTY SCHOOL DISTRICT, | |
| Defendant. | |

## ORDER

This matter is before the Court on a Motion to Dismiss, dkt. no. 8, by Defendant Wayne County School District ("Wayne County" or the "School District"). The motion has been fully briefed and is ripe for review. For the reasons below, Wayne County's Motion is **GRANTED in part** and **DENIED in part**.

## BACKGROUND

The following background information is taken from Plaintiffs Amended Complaint and is, at this stage only, taken as true. As the case progresses, these allegations may or may not prove to be accurate. In July 2015, the School District hired Plaintiff Sabrina Johnson-Nixon, a black female, as an intern school psychologist. See Dkt. No. 5 ¶¶ 7, 10, 12. She was supervised by Mary Wildes and Lisa Fore, the Special Education Director and a fellow school psychologist, respectively. Id. ¶¶ 12-13. Johnson-Nixon alleges

that shortly after starting work for the School District, Fore told her, "we have had black intern psychologists here before, and if they did not stay in their place, they did not make it here." Id. ¶ 17. Fore added that she does not offer help, instruct, or give supplies to black intern psychologists who did not "stay in their place." Id. ¶ 18. Fore told Johnson-Nixon to "stay in her place." Id. ¶ 16.

In October 2015, Johnson-Nixon contacted Wildes, as well as Merwan Massa, the Human Resources Director, and Brinson, the school Superintendent, reporting what she perceived to be unfair supervisory practices. Id. ¶ 20. She further expressed concern that information submitted in an evaluation by Fore to Wildes was not accurate. Id. ¶ 21. In early November, Massa advised Johnson-Nixon that he had spoken with all involved in the conflict and intended to schedule a meeting. Id. ¶ 24. Several days later, Johnson-Nixon met with Wildes and the school's Special Education Director, who presented her with a "Professional Development Plan for Improvement (PDP)" based on alleged deficiencies in Johnson-Nixon's performance. Id. ¶ 25. By the end of the meeting, however, Wildes told Johnson-Nixon that the PDP was unnecessary. Id. In late November 2015, Johnson-Nixon met with Brinson and Massa to describe what she perceived to be discriminatory and retaliatory behavior by School District employees. See id. ¶ 27-28. Later that day, Johnson-Nixon discovered Wildes and Fore going through Johnson-

Nixon's files without her permission. See id. ¶ 30. Johnson-Nixon sent an email to Brinson and Massa about the incident. Id. On the next day, Fore moved Johnson-Nixon's belongings out of their shared office, and thereafter employees in the Special Education Department excluded her from important work-related communications. See id. ¶¶ 31-33.

In January 2016, Wildes resurrected the previously withdrawn PDP and informed Johnson-Nixon about several additional job expectations. Id. ¶ 37. Eventually, Wildes also began to delay approval of Johnson-Nixon's psychological reports which, according to Johnson-Nixon, made it "more difficult to meet Georgia Department of Education submittal deadlines, and sowing potential dissatisfaction from School District teachers needing [her] support." Id. 39. Johnson-Nixon also alleges that in early February 2016, she attended a Special Education Leadership Team meeting—despite not being notified—and was instructed by Wildes to leave in front of others at the meeting. Id. ¶ 42. Two days later, Wildes informed Johnson-Nixon that she would not be offered an employment contract for the following school year. Id. ¶ 44.

On February 17, 2016, Johnson-Nixon filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") for discrimination and retaliation based on race. Id. ¶ 47. The following month, Wildes gave Johnson-Nixon a load of student evaluations that would have been impossible to accomplish

before the end of the year. Id. ¶ 48. Moreover, in May 2016, Brinson formally notified Johnson-Nixon that her employment with the School District would terminate at the conclusion of the school year. Id. ¶ 50. Brinson refused to offer a reason for the termination. Id. ¶ 51.

In August 2019, Johnson-Nixon filed the present action against the School Board. Dkt. No. 1. Her amended complaint asserts claims under 42 U.S.C. § 1981 for retaliation for opposing racial discrimination (Count I), retaliation for participating in an investigation and proceeding (Count II), creating a racially hostile work environment (Count III), and disparate treatment based on race (Count IV). Dkt. No. 5. In November 2019, Wayne County filed a Motion to Dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure seeking to dismiss Johnson-Nixon's claims as barred by the relevant statute of limitations. For the reasons below, the Court finds that Johnson-Nixon's claims concerning the School District's refusal to renew her contract are time-barred but that her remaining claims are timely.

## DISCUSSION

The only issue before the Court in the present motion is the appropriate limitations period to apply to Johnson-Nixon's claims under 42 U.S.C. § 1981. Prior to 1991, the applicable limitations period for § 1981 claims was, "the most appropriate or analogous state statute of limitations." Grimes v. Bd. of Regents of the

Univ. Sys. Of Ga., 650 Fed. App'x 647, 651 (11th Cir. 2016) (quoting Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 371 (2004)). The parties agree that the applicable limitations period under this framework is Georgia' two-year limitations period for personal injury actions. See dkt. no. 8-1 at 5; dkt. no. 9 at 4. However, in 1990, Congress enacted 28 U.S.C. § 1658, which created a four-year limitations period for civil actions "arising under an Act of Congress enacted after [December 1, 1990]." Thereafter, in 1991, Congress amended § 1981 to broaden the scope of claims falling within its purview. See Grimes, 650 F. App'x at 651. Since then, the Supreme Court has held that because the 1991 amendment "enlarged the category of conduct that is subject to § 1981 liability," it "fully qualifies as an Act of Congress enacted after [December 1, 1990] within the meaning of [28 U.S.C.] § 1658. Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 383 (2004) (internal quotations omitted). Therefore, the Supreme Court concluded that a cause of action "aris[es] under an Act of Congress enacted after December 1, 1990—and is therefore governed by § 1658's 4-year statute of limitations—if the plaintiff's claim against the defendant was made possible by a post-1990 enactment." Id. at 382 (internal quotations omitted).

Here, the parties dispute which of Johnson-Nixon's claims are "made possible by" the 1991 amendment to § 1981 and subject to the 4-year limitations period; however, the parties agree that any

5

claims subject to Georgia's two-year limitations period are time-barred. To address this issue, the Court must ultimately determine which—if any—of Johnson-Nixon's claims could have been brought under the pre-1991 version of § 1981.

As originally drafted, 42 U.S.C. § 1981 declared that citizens of all races shall have the same right to, inter alia, "make and enforce contracts." Act of Apr. 9, 1866, Ch. 395, § 1, 14 Stat. 27. In 1988, the Supreme Court interpreted the scope of this provision narrowly, finding that it only forbids "the mak[ing] and enforce[ment] of contracts alone," as opposed to "a general proscription of racial discrimination in all aspect of contract relations." Patterson v. McLean Credit Union, 491 U.S. 164, 176 (1989). In Patterson, a black female sued her former employer under § 1981 alleging that she had been harassed, passed over for a promotion, and ultimately fired, all because of her race. Id. at 169. The Court summarized her claims as follows:

> [her supervisor] periodically stared at her for several minutes at a time; that he gave her too many tasks, causing her to complain that she was under too much pressure; that among the tasks given her were sweeping and dusting, jobs not given to white employees. On one occasion, she testified, [her supervisor] told [her] that blacks are known to work slower than whites. According to [the plaintiff, her supervisor] also criticized her in staff meetings while not similarly criticizing white employees.

Id. at 178.

In finding this conduct was not prohibited by § 1981, the Court found that "none of the conduct . . . involves either a refusal to make a contract with [the plaintiff] or the impairment of her ability to enforce her established contract rights." Id. at 179. The Court reasoned that § 1981, as it existed at that time, protects only two rights: to make and to enforce contracts. Id. at 177. The former right "extend[ed] only to the formation of a contract, but not to problems that may arise later from the conditions of continuing employment." Id. The latter right "prohibit[ed] discrimination that infects the legal process in ways that prevent one from enforcing contract rights . . . [and] also cover[ed] wholly private efforts to impede access to the courts or obstruct nonjudicial methods of adjudicating disputes about the force of binding obligations." Id.

In response to Patterson and its progeny, Congress amended § 1981 to expand the scope of its bar on contract-based discrimination. See Andrews v. Lakeshore Rehabilitation Hosp., 140 F.3d 1405, 1410 (11th Cir. 1998) ("Both the Supreme Court and this Court have acknowledged that the 1991 Act was a direct response to Patterson and its progeny."). Under the amended version of the statute, the term "make and enforce contracts" is defined to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C.

§ 1981(b). Following this amendment, § 1981 now also covers "post-formation conduct, such as the imposition of discriminatory working conditions." <u>Grimes</u>, 650 Fed. App'x 647, (11th Cir. 2016).

At the outset, the Court finds that any of Johnson-Nixon's claims related to the School District's decision not to renew her contract are cognizable under the pre-1991 version of § 1981 and are therefore time-barred. These claims are premised on the contention that Johnson-Nixon "would not be offered an employment contract for the next school year," dkt. no. 5 ¶ 44, and therefore relate to the "formation of a contract," <u>Patterson</u>, 491 U.S. at 177.[1] Though Johnson-Nixon argues that the refusal to renew occurred "only after formation and during execution of her [existing] contract with the School District," dkt. no. 9 at 10, the School District simply did not impair "her ability to enforce her established contract rights" by choosing not to create a new contract. <u>Id.</u> <u>Patterson</u>, 491 U.S. at 179. Accordingly, the Court finds that any of Johnson-Nixon's claims related to the School District's refusal to renew her contract for a new school year must be **DISMISSED** as untimely raised.

---

[1] Though Johnson-Nixon later alleges in her Amended Complaint that she was notified that her contract "would terminate at the conclusion of the school year," dkt. no. 5 ¶ 50, it appears that she is referring to the fact that she would not be offered a new contract after her existing contract expired. As Wayne County notes, Georgia law requires that local governing boards "tender a *new* contract for the ensuing school year to each teacher and other professional employee." O.C.G.A. § 20-2-211(b).

8

Nevertheless, the Court finds that each of Johnson-Nixon's causes of action raise some claims "made possible by" the 1991 amendment to § 1991. Jones, 541 U.S. at 382. For example, in each count Johnson-Nixon alleges that she was subjected to "abusive treatment" or "harassment" by the School District based on her race. See Dkt. No. 5 ¶¶ 55, 65, 73, 81-82. She also offers factual support for these claims, contending, inter alia, that she was verbally harassed by one of her supervisors based on her race; that she was given an unreasonably heavy assignment load after reporting discrimination; and that her co-workers withheld important information from her about her job duties. Ultimately, these claims are strikingly similar to the plaintiff's claims in Patterson that the Court found did not "involve[] either a refusal to make a contract with [the plaintiff] or the impairment of her ability to enforce her established contract rights." 491 U.S. at 179. Accordingly, the Court concludes that Johnson-Nixon has alleged some claims that could not have been raised under the pre-1991 version of § 1981—yet are cognizable under the present version—and therefore that these claims were timely filed.

## CONCLUSION

For the reasons above, Wayne County's Motion to Dismiss, dkt. no. 8, is **GRANTED in part** and **DENIED in part**. To the extent Johnson-Nixon's claims involve the School District's failure to renew her contract, such claims are **DISMISSED** as untimely. All other claims,

9

however, concerning Johnson-Nixon's treatment during the course of her employment with Wayne County remain a part of her action.

**SO ORDERED**, this 7th day of April, 2020.

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA